[Cite as *State v. Scarberry*, 2016-Ohio-7065.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 15AP-775 |
| v. | : | (C.P.C. No. 14CR-1707) |
| Kyle D. Scarberry, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on September 29, 2016

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee. **Argued:** *Sheryl L. Prichard*.

**On brief:** *Yeura R. Venters*, Public Defender, and *George M. Schumann*, for appellant. **Argued:** *George M. Schumann*.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, P.J.

{¶ 1} Defendant-appellant, Kyle D. Scarberry, appeals the July 15, 2015 judgment of the Franklin County Court of Common Pleas convicting him, pursuant to a plea of no contest, and imposing sentence. For the following reasons, we reverse the judgment of the trial court.

## I. History of the Case

### A. Procedural History

{¶ 2} On April 2, 2014, a Franklin County Grand Jury filed an indictment charging appellant with a single count of possession of drugs, in violation of R.C. 2925.11, a felony of the fifth degree. On July 22, 2014, appellant filed a motion to suppress. On May 7, 2015, the trial court held a suppression hearing at which the trial court denied

appellant's motion to suppress.  Following the denial of his motion to suppress, appellant entered a plea of no contest.  On July 13, 2015, the trial court held a sentencing hearing, imposing a sentence of community control for a period of five years and suspending appellant's driver's license for a period of six months.  On July 15, 2015, the trial court filed a judgment entry reflecting appellant's conviction and sentence.

### B. Factual History

{¶ 3}  At the suppression hearing, plaintiff-appellee, State of Ohio, called Officer Joseph Hughes of the Grove City Police Department as its sole witness.  During Officer Hughes' testimony, the state played a video recording from Officer Hughes' cruiser of the incident in question; however, there was no accompanying audio recording, as Officer Hughes stated that his microphone was not working during the stop.

{¶ 4}  Officer Hughes testified that on November 8, 2013, at approximately 2:00 a.m., he was on patrol when he saw appellant commit a traffic violation.  Officer Hughes stated he was familiar with appellant because appellant had previously been charged with possession of heroin.  After observing the traffic violation and following appellant's vehicle for a brief time, Officer Hughes activated his lights and directed appellant to pull over.  Appellant stopped his vehicle in the driveway of an apartment building, and Officer Hughes parked his police cruiser in the driveway behind appellant's vehicle.

{¶ 5}  Officer Hughes exited his cruiser and approached appellant's vehicle.  Officer Hughes informed appellant that he had committed a traffic violation due to his failure to stop behind a marked stop line.  Officer Hughes gave appellant a verbal warning and then told him "he was free to go at any time."  (May 7, 2015 Tr. at 17.)  However, after telling appellant he was free to leave, Officer Hughes immediately asked appellant whether he would consent to exiting his vehicle for a pat-down search.  Specifically, Officer Hughes testified that he said: " 'Mr. Scarberry, before you pull away, you're free to go, but, before you pull away, would you mind stepping out of the vehicle so I can complete a pat-down of you?' "  (May 7, 2015 Tr. at 18.)  Officer Hughes stated that appellant replied affirmatively to the request for a pat-down search.  While Officer Hughes was addressing appellant, and before appellant had exited his vehicle, another officer, whom Officer Hughes identified as a "backup officer," arrived and walked toward appellant's vehicle.  (May 7, 2015 Tr. at 17.)  Officer Hughes agreed that approximately 30

seconds elapsed between his initial contact with appellant and the time appellant consented to be searched.

{¶ 6} After allegedly giving his consent to the pat-down search, appellant exited his vehicle and stood facing the driver's side of the vehicle. Officer Hughes testified that he deliberately positioned appellant next to his vehicle so that appellant was encircled on all sides. Specifically, Officer Hughes stated:

> Mr. Scarberry steps out here. I begin my pat-down of him. My backup officer, one side is covered by a building. The other side is blocked by the door. The other side is blocked by the vehicle. So my backup officer took placement here to block the side in case he would try to run.

(May 7, 2015 Tr. at 18-19.) On cross-examination, Officer Hughes clarified:

> [Appellant's Counsel]: I kind of gathered there's a design or a purpose for the way you've situated everybody here; correct?
>
> [Officer Hughes]: Yes, sir.
>
> [Appellant's Counsel]: You've got your partner here; you've got the door open right here?
>
> [Officer Hughes]: Yeah. Three sides are blocked. The backup is there to block the fourth side from someone running. If someone tried to run away, he was there.

(May 7, 2015 Tr. at 28.) The video recording reflects appellant was positioned facing the driver's side of his vehicle, with the driver's door open to his left. Officer Hughes stood behind appellant while he searched him, and the backup officer stood to appellant's right.

{¶ 7} Officer Hughes testified that, while he was searching appellant, he asked appellant whether he "could remove the items in his pockets," and appellant replied affirmatively. (May 7, 2015 Tr. at 19.) Later, Officer Hughes testified that he asked appellant if he "would * * * mind if I remove the items from your pocket and look at them?" (May 7, 2015 Tr. at 20.) In the video recording, appellant appears to nod while being searched by Officer Hughes.

{¶ 8} During the pat-down search, Officer Hughes removed a cigarette pack from appellant's pocket, opened the pack, and found what he suspected was heroin wrapped in plastic within the cigarette pack. Officer Hughes testified that he would not have removed

the cigarette pack from appellant's pocket if he did not have consent.  Although the video recording does not clearly reflect whether Officer Hughes placed appellant in handcuffs before he opened the cigarette pack or afterward, Officer Hughes testified as follows:

> [Officer Hughes]: [O]nce I pulled the cigarette packet out and I saw it, I immediately just put him in handcuffs after that.
>
> [Assistant Prosecutor]: You saw what?
>
> [Officer Hughes]: The suspected heroin inside the cigarette container wrapped in plastic.

(May 7, 2015 Tr. at 20.)  After placing appellant in handcuffs, Officer Hughes completed a more thorough search of appellant and found a syringe in another pocket on appellant's person.  Officer Hughes acknowledged that he was not going to cite appellant for the alleged traffic violation, but did eventually cite appellant after arresting him.

{¶ 9}  Officer Hughes stated that appellant was "very cooperative" throughout the incident, and noted that appellant had a "speech and hearing issue, so his speaking to me was very short."  (May 7, 2015 Tr. at 23-24.)  When asked whether there was any indication that appellant did not understand what Officer Hughes was asking him to do, Officer Hughes replied, "No."  (May 7, 2015 Tr. at 24.)

{¶ 10} On redirect examination, Officer Hughes testified regarding whether or not he asked appellant if he had any contraband or weapons in his vehicle:

> [Assistant Prosecutor]: [D]o you remember asking [appellant] if he had anything illegal in his car before you asked him for consent?
>
> [Officer Hughes]: Yes, sir.
>
> [Assistant Prosecutor]: When was that? Well, obviously, before you asked him for consent, but can you describe that in a little more detail?
>
> [Officer Hughes]: Yes. It would have been when I was up there talking to him about the traffic violation he made. I would have asked him, "[Appellant], is there anything illegal in the vehicle that I should be aware of? Any guns? Knives? Drugs? Bombs? Anything of that nature?"
>
> Again, he replied, "No."

> [Assistant Prosecutor]: So that's when you asked him, "Can I search you?"
>
> [Officer Hughes]: Yeah, and advised him all in that conversation that he was free to leave. I asked him to step out of the vehicle to perform a pat-down, and he complied.

(May 7, 2015 Tr. at 34.)   Furthermore, when asked on recross-examination whether he "thought there could be some heroin" in appellant's vehicle, Officer Hughes responded: "Guns and knives go together.  That's why I asked. I know he commonly uses drugs, so there's reason for me to believe there could be a weapon involved."  (May 7, 2015 Tr. at 36.)   However, when asked whether he had ever seen appellant with a gun or knife, Officer Hughes responded, "I've never seen him, no."  (May 7, 2015 Tr. at 36.)

{¶ 11}  Appellant did not call any witnesses at the suppression hearing.

## II.  Assignment of Error

{¶ 12}  Appellant appeals and assigns the following sole assignment of error for our review:

> The trial court erred in denying the defendant-appellant's motion to suppress unconstitutionally obtained evidence.

## III.  Discussion

{¶ 13} In his sole assignment of error, appellant asserts the trial court erred in denying his motion to suppress.

### A.  Standard of Review

{¶ 14} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. *See also State v. Belton*, ___ Ohio St.3d ___, 2016-Ohio-1581, ¶ 100, citing *Burnside*.  In evaluating the motion to suppress, the trial court acts as the finder of fact and, therefore, is in the best position to resolve factual questions and evaluate the credibility of witnesses. *Burnside* at ¶ 8.  Therefore, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id. See also State v. Johnson*, 10th Dist. No. 13AP-637, 2014-Ohio-671, ¶ 6 ("We apply a de novo standard in determining whether the trial court properly denied appellant's motion to suppress.").

**B. Applicable Law**

1. Constitutional Protections

{¶ 15} The Fourth Amendment to the United States Constitution, applied to the states through the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or other things to be seized." Article I, Section 14 of the Ohio Constitution contains a nearly identical provision:

> The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched and the person and things to be seized.

*See also* R.C. 2933.22(A), and Crim.R. 41(C).

{¶ 16} Historically, the protections afforded by Article I, Section 14 of the Ohio Constitution have been construed as coextensive with the protections of the Fourth Amendment of the United States Constitution. *State v. Geraldo*, 68 Ohio St.2d 120, 125-26 (1981) ("We are disinclined to impose greater restrictions in the absence of explicit state constitutional guarantees protecting against invasions of privacy that clearly transcend the Fourth Amendment. * * * It is our opinion that the reach of Section 14, Article I, of the Ohio Constitution * * * is coextensive with that of the Fourth Amendment."); *State v. Robinette*, 80 Ohio St.3d 234, 239 (1997) ("*Robinette III*") (stating that courts "should harmonize * * * interpretation of Section 14, Article I of the Ohio Constitution with the Fourth Amendment, unless there are persuasive reasons to find otherwise"); *State v. Jones*, 88 Ohio St.3d 430, 434 (2000), *modified in State v. Brown*, 99 Ohio St.3d 323, 2003-Ohio-3931, syllabus. However, it is well-recognized that states may "rely on their own constitutions to provide broader protection for individual rights, independent of protections afforded by the United States Constitution." *Robinette III* at 238. *See Arnold v. Cleveland*, 67 Ohio St.3d 35, 38 (1993), paragraph one of the syllabus ("In the areas of individual rights and civil liberties, the United States Constitution, where applicable to the states, provides a floor below which state court

decisions may not fall."). Thus, in certain circumstances, the Supreme Court of Ohio has construed Article I, Section 14 of the Ohio Constitution as providing greater protection than the Fourth Amendment to the United States Constitution. *Brown* at ¶ 22; *State v. Brown*, 143 Ohio St.3d 444, 2015-Ohio-2438, ¶ 23 ("Article I, Section 14 of the Ohio Constitution affords greater protection than the Fourth Amendment against searches and seizures conducted by members of law enforcement who lack authority to make an arrest."). *See Robinette III* at 238 (noting that a "state may impose greater restrictions on police activity pursuant to its own state constitution than is required by federal constitutional standards").

### 2. Consent as an Exception to the Warrant Requirement

{¶ 17} "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991), citing *Katz v. United States*, 389 U.S. 347, 360 (1967). "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Id.* at 250. In keeping with this principle, " 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " *Arizona v. Gant*, 556 U.S. 332, 338 (2009), quoting *Katz* at 357. *See Arnold* at 45 (recognizing exceptions to the search warrant requirement under the Ohio Constitution); *State v. Kessler*, 53 Ohio St.2d 204, 207 (1978).

{¶ 18} Thus, both the Fourth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, and Article I, Section 14 of the Ohio Constitution prohibit the government from conducting warrantless searches and seizures, subject to certain exceptions. *State v. Limoli*, 10th Dist. No. 11AP-924, 2012-Ohio-4502, ¶ 20, citing *State v. Fowler*, 10th Dist. No. 10AP-658, 2011-Ohio-3156, ¶ 11-12. *See also Stone v. Stow*, 64 Ohio St.3d 156, 163 (1992), fn. 4. Among others, "consent signifying waiver of constitutional rights" has been recognized as an exception to the search warrant requirement. *State v. Alihassan*, 10th Dist. No. 11AP-578, 2012-Ohio-825, ¶ 8, citing *State v. Akron Airport Post No. 8975*, 19 Ohio St.3d 49, 51 (1985). *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *Jimeno* at 250-51 (stating that "we have long approved consensual searches because it is no doubt reasonable for the police

to conduct a search once they have been permitted to do so").  "[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion).  "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno* at 251.

{¶ 19} "In determining the voluntariness of [a person's] consent to a search, a court must apply a different standard when [the] consent is given during a lawful police detention as opposed to an unlawful detention." *Limoli* at ¶ 22.  "[W]hen a person is *lawfully detained* by police and consents to a search, the state must show by clear and convincing evidence that the consent was freely and voluntarily given. * * * Important factors in determining the voluntariness of consent are: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found."  (Emphasis sic.) (Citations omitted.) *Id.*

{¶ 20} However, when a person offers consent to a search during an unlawful police detention, the state must meet a more stringent standard in determining whether the consent was freely and voluntarily given.  *Id.* at ¶ 23.  When consent is obtained after illegal police activity, " '[t]he consent will be held voluntary only if there is proof of an unequivocal break in the chain of illegality sufficient to dissipate the taint of the prior illegal action.' " *Alihassan* at ¶ 26, quoting *State v. Retherford*, 93 Ohio App.3d 586, 602 (2d Dist.1994), citing *Royer* at 501.  *See also State v. Spain*, 10th Dist. No. 09AP-331, 2009-Ohio-6664, ¶ 26, quoting *State v. Melvin*, 8th Dist. No. 88611, 2007-Ohio-3779, ¶ 37, quoting *Royer* at 501 ("[W]hen consent is 'obtained during an illegal detention, the consent is negated "even though voluntarily given if [the consent is] the product of the illegal detention and not the result of an independent act of free will." ' ").  In order for the illegally detained person's consent to be considered an independent act of free will, "the

totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave." *Robinette III* at paragraph three of the syllabus. "Factors to consider in determining whether the consent is sufficiently removed from the taint of the illegal police activity include the length of time between the illegal activity and the subsequent search, the presence of intervening circumstances, and the purpose and flagrancy of the misconduct." *Alihassan* at ¶ 26. *See State v. Doane*, 1st Dist. No. C-040523, 2005-Ohio-2740, ¶ 16, fn. 24, citing *United States v. Lopez-Arias*, 344 F.3d 623, 630 (6th Cir.2003); *Brown v. Illinois*, 422 U.S. 590, 603 (1975). "The state 'bears the burden of proving, by "clear and positive" evidence, that consent was freely and voluntarily given.' " *Spain* at ¶ 26, quoting *Melvin* at ¶ 37, citing *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). *See State v. Posey*, 40 Ohio St.3d 420, 427 (1988).

{¶ 21} Importantly, regardless of whether consent is given during a lawful or unlawful detention, a court must examine the totality of the circumstances in determining the voluntariness of consent to be searched. *Limoli* at ¶ 24, citing *State v. Lattimore*, 10th Dist. No. 03AP-467, 2003-Ohio-6829, ¶ 9, and *Robinette III* at paragraphs two and three of the syllabus; *Alihassan* at ¶ 26 ("Voluntariness is a question of fact and depends on the totality of the circumstances.").

3. Lawfulness of Detention

{¶ 22} "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809-10 (1996). "[A] routine traffic stop is 'more analogous to a so-called "*Terry* [*v. Ohio*, 392 U.S. 1 (1968)] stop" . . . than to a formal arrest.' " *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015), quoting *Knowles v. Iowa*, 525 U.S. 113, 117 (1998).

{¶ 23} Under *Terry v. Ohio*, 392 U.S. 1 (1968), an investigatory stop and a frisk or pat-down for weapons may be conducted without violating the Fourth Amendment's ban on unreasonable searches and seizures if two conditions are met. First, the investigatory stop must be lawful. A stop is lawful where an investigating officer "reasonably suspects that the person apprehended is committing or has committed a criminal offense."

*Arizona v. Johnson*, 555 U.S. 323, 326 (2009).  *See State v. Fisher*, 10th Dist. No. 10AP-746, 2011-Ohio-2488, ¶ 18, citing *State v. Williams*, 51 Ohio St.3d 58, 60-61 (1990) ("To justify a brief investigative stop or detention of an individual pursuant to *Terry*, a police officer must be able to cite specific and articulable facts which, taken together with rational inferences derived from those facts, give rise to a reasonable suspicion that the individual is engaged or about to be engaged in criminal activity.").  Second, in order to proceed from a stop to a frisk or pat-down, the investigating officer "must reasonably suspect that the person stopped is armed and dangerous." *Johnson*, 555 U.S. at 327.

{¶ 24} Recently, the United States Supreme Court held that "in a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Id.*  As a result, "[t]he police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity." *Id.*

{¶ 25} Detention arising from a traffic stop remains lawful for the amount of time reasonably required to complete the stop's mission.  "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop * * * and attend to related safety concerns." *Rodriguez* at 1614.  "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.' " *Id.*, quoting *Royer* at 500.  "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*  *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."); *Johnson*, 555 U.S. at 333 ("A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation" and such lawful stop "ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave.").  "On-scene investigation into other crimes, however, detours from [the] mission" of the traffic stop, including "safety precautions taken in order to facilitate such detours." *Rodriguez* at 1616.

{¶ 26} When justification for the original detention ends, there must be an additional reasonable suspicion of illegal activity in order to justify the continued

detention. *State v. Tyler*, 10th Dist. No. 13AP-220, 2013-Ohio-4673, ¶ 15. "When a police officer's objective justification to continue detention of a person stopped for a traffic violation for the purpose of searching the person's vehicle is not related to the purpose of the original stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some illegal activity justifying an extension of the detention, the continued detention to conduct a search constitutes an illegal seizure." *Robinette III* at paragraph one of the syllabus, modifying *State v. Robinette*, 73 Ohio St.3d 650 (1995), paragraph one of the syllabus ("*Robinette I*"). *See also State v. Ferrante*, 196 Ohio App.3d 113, 2011-Ohio-4870, ¶ 21 (2d Dist.).

{¶ 27} Moreover, even when the first condition is satisfied by a lawful stop for purposes of investigating a traffic violation, the second condition—a reasonable suspicion that the person stopped is armed and dangerous—must still be satisfied in order to justify a pat-down search during a traffic stop. "To justify a patdown of the driver or a passenger *during a traffic stop*, * * * just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." (Emphasis added.) *Johnson*, 555 U.S. at 327. *See State v. Evans*, 67 Ohio St.3d 405, 408-09 (1993), quoting *State v. Bobo*, 37 Ohio St.3d 177 (1988), paragraph two of the syllabus (" 'Where a police officer, *during an investigative stop*, has a reasonable suspicion that an individual is armed based on the totality of the circumstances, the officer may initiate a protective search for the safety of himself and others.' ") (Emphasis added.); *State v. Moorer*, 10th Dist. No. 14AP-224, 2014-Ohio-4776, ¶ 21 ("[A]n officer does not have authority to automatically conduct a search of a detainee when a valid stop has been initiated. * * * In order to conduct a pat-down search for weapons, an officer must have reason to believe that an individual is armed and dangerous."). " 'The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.' " *Evans* at 408, quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972). *See State v. Millerton*, 2d Dist. No. 26209, 2015-Ohio-34, ¶ 26.

{¶ 28} In *Robinette I*, the Supreme Court of Ohio examined the constitutionality of a search following a traffic stop. In that case, a police officer stopped Robinette for committing a speeding violation. On request, Robinette provided the officer with his

driver's license.  After checking Robinette's license, the officer asked Robinette to step out of his vehicle and move between his vehicle and the officer's cruiser.  Robinette complied and the officer then issued him a verbal warning and returned his license.  After returning the license, the officer asked for drug interdiction purposes whether Robinette was carrying any contraband or weapons in his vehicle.  Although Robinette replied that he did not have any contraband in his vehicle, the officer asked for consent to search the vehicle. Robinette "testified that he was shocked at the question and 'automatically' answered 'yes' to the deputy's request.  Robinette testified further that he did not believe that he was at liberty to refuse the deputy's request."  *Id.* at 652.  Upon searching Robinette's vehicle, the officer found contraband, resulting in Robinette's arrest.

{¶ 29} On review, the Supreme Court found that "[w]hen the motivation behind a police officer's continued detention of a person stopped for a traffic violation is not related to the purpose of the original, constitutional stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some separate illegal activity justifying an extension of the detention, the continued detention constitutes an illegal seizure."  *Id.* at paragraph one of the syllabus.  Therefore, the court concluded that the search was invalid because it was the product of an unlawful seizure.  Furthermore, the court created a bright-line test stating that "citizens stopped for traffic offenses [must] be clearly informed by the detaining officer when they are free to go after a valid detention, before an officer attempts to engage in a consensual interrogation."  *Id.* at paragraph two of the syllabus.

{¶ 30} On appeal, the United States Supreme Court found that it possessed jurisdiction to hear the appeal because, although the Supreme Court of Ohio's decision in *Robinette I* mentioned Article I, Section 14 of the Ohio Constitution, "the opinion clearly relies on federal law nevertheless."  *Ohio v. Robinette*, 519 U.S. 33, 36 (1996) ("*Robinette II*").  Turning to the merits, the United States Supreme Court held that the Fourth Amendment of the United States Constitution does not require that a lawfully seized defendant must be advised that he or she is "free to go" before his or her consent to search will be recognized as voluntary.  *Robinette II* at 36.  In so holding, the United States Supreme Court reaffirmed its rejection of bright-line rules for determining whether a

search was reasonable. Rather, the court concluded that reasonableness was to be "measured in objective terms by examining the totality of the circumstances." *Id.* at 39.

{¶ 31} On remand, the Supreme Court of Ohio examined the question of "whether this court's prior holding should be reaffirmed under the adequate and independent ground of the Constitution of the state of Ohio." *Robinette III* at 237. In consideration of this question, the court first examined "whether Robinette's stop and continued detention were justified." *Id.* at 239. The court found that because it was undisputed that Robinette was speeding, the officer's acts of stopping Robinette and ordering Robinette to exit the vehicle were justified. However, once the officer "administered the warning for speeding to Robinette, the reason for the stop ended." *Id.* Thus, the court was next required to consider the officer's acts of asking whether Robinette was carrying contraband and the subsequent request to search Robinette.

{¶ 32} First, although the reason for the stop had ended, the court found that, pursuant to *Royer* and *Brown v. Texas*, 443 U.S. 47 (1979), the officer was "justified in briefly detaining Robinette in order to ask him whether he was carrying any illegal drugs or weapons pursuant to the drug interdiction policy." *Robinette III* at 241. Next, the court examined whether the continued detention of Robinette after that point was lawful. The court opined that "[i]f during the initial detention to ask the contraband question, the officer ascertained reasonably articulable facts giving rise to a suspicion of criminal activity, the officer may then further detain and implement a more in-depth investigation of the individual." *Id.* However, since the officer in that case did not have any reasonably articulable facts or individualized suspicion, the continued detention of Robinette was not justified. As a result, the continued detention of Robinette constituted an illegal seizure.

{¶ 33} Having determined that Robinette was unlawfully seized at the time he gave consent to the search, the court next examined whether the state met its burden of establishing that Robinette's consent was given as an independent act of free will under the totality of the circumstances. In its analysis of this question, the court focused on the circumstances surrounding the request for consent, especially noting that after the officer issued the verbal warning, he immediately transitioned into asking whether Robinette possessed any contraband and whether he could conduct a search. The court found that "[t]he timing of [the officer's] immediate transition from giving Robinette the warning for

speeding into questioning regarding contraband and the request to search is troubling." *Robinette III* at 244. Furthermore, the court stated that " '[t]he transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to allow.' " *Robinette III* at 244, quoting *Robinette I* at 654.

{¶ 34} The court found that "[w]hen these factors are combined with a police officer's superior position of authority, any reasonable person would have felt compelled to submit to the officer's questioning," and, as a result, "[w]hile [the officer's] questioning was not expressly coercive, the circumstances surrounding the request to search made the questioning impliedly coercive." *Robinette III* at 244-45. The court concluded that the totality of the circumstances demonstrated that Robinette "merely submitted to 'a claim of lawful authority' rather than consenting as a voluntary act of free will," and, therefore, the state failed to carry its burden of demonstrating Robinette's consent was an independent act of free will. *Id.*, quoting *Royer* at 497.

### C. Analysis

{¶ 35} In this case, we are asked to determine whether the search of appellant violated the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution. Therefore, we must examine: (1) whether appellant was lawfully detained at the time of the request to search, and (2) whether appellant voluntarily consented to the search.

#### 1. Lawfulness of Search

{¶ 36} Appellant does not contest the initial stop for committing an alleged traffic violation but, rather, contends that "Officer Hughes's request for consent to get out of the car and submit to a pat-down illegally expanded the scope and duration of the seizure." (Appellant's Brief at 16.) We begin by reviewing the trial court's determination. After hearing testimony from the Officer Hughes, arguments from counsel, and watching portions of the video recording of the incident again, the trial court took a recess and then announced its decision:

> I will deny the motion to suppress. In going through this,
> there are several aspects of searches here. The initial

confrontation was based upon a traffic offense and those elements of a Terry search. I think the defendant did consent to being patted down.

The next question becomes the result of those pat-downs. Clearly, it wasn't a weapon -- that's usually the situation in a Terry search -- nor do we have a plain-view situation * * *.

But we still have the officer asking questions. I don't see any indicia of it being a coercive situation. I realize there's a second officer there, but in viewing the tape -- and I think in the testimony and from the officer's statement -- I don't think there's any situation where the consent would be -- or any indication that the consent was coerced or in any way forced under the circumstances.

The Court does have a little concern about some of the timing of things and the going back, but I don't have any testimony that he put him under arrest first, so I'm going to have to overrule the motion.

* * *

We're going to go through this issue because we have various aspects. It's almost like a checklist of search and seizure law. The initial stop, I don't particularly have a problem with it. He saw the traffic violation. That's the thing.

He has certain rights under Terry to search at that point in time. It is the hour of the day, you know, and various other aspects. Then the issue of consent comes up.

(May 7, 2015 Tr. at 54-56.)

{¶ 37} Thereafter, appellant's counsel asserted objections to the trial court's decision:

[Appellant's Counsel]: [E]ven the officer acknowledges that there doesn't appear to be any dispute that the reason for this traffic stop is done, is done. So at that point, Terry goes out the window because there's no reasonable, articulable suspicion of criminal activity. He's done at that point; he's letting him go. So Terry doesn't kick in.

[The Court]: I'm going to disagree with you in part. It's about a reasonable period of time that the officer is there. I don't necessarily think you can say it's done, but you can go ahead and make your record.

[Appellant's Counsel]: Well, I think --

[The Court]: I mean, we're talking about 22 seconds basically.

[Appellant's Counsel]: Right. And I think that cuts both ways. I understand one can say, well, that's not an unreasonable detention. However, I think the Rodriguez case a couple weeks ago that I mentioned, there's no -- there's no allowable amount of time or anything.

Once the purpose -- and that's -- that was just restating, I think, what the law is. Once the purpose of the traffic stop is over with, anything after that is unlawful.

* * *

[The Court]: I'll be quite frank with you. There were several things that come to my attention. It was a directed Terry search to a particular area. It wasn't like he checked the whole place and then he asked about what was in his pockets. Okay?

Don't think that didn't cross my mind. But in looking at the totality of things, I can't say that there's been a constitutional violation. I think there's a consent situation.

You know, we can't necessarily take these things in a vacuum and say, well, it's one factor. I have to look at the totality of the circumstances.

That will be the ruling.

(May 7, 2015 Tr. at 56-57, 59.)

{¶ 38} Although not explicitly stated, based on the above record, the trial court appears to have concluded that appellant's continued detention following the initial traffic stop was a *Terry* stop and, therefore, lawful. For the following reasons, we disagree.

{¶ 39} First, Officer Hughes sought consent to search appellant following the completion of the traffic stop. We have held that "[w]here an officer observes a violation of law, lawfully stops that individual in connection with that violation, and, *prior to completing the purpose of the stop, asks permission to conduct a search*, the request occurs during a lawful detention." (Emphasis added.) *Limoli* at ¶ 34; *see Lattimore* at ¶ 12. Here, however, Officer Hughes testified that he sought appellant's consent to search after he determined that he was not going to issue appellant a citation for the traffic

violation and specifically told appellant that he was "free to go."  (May 7, 2015 Tr. at 17.) Based on these facts, we find that Officer Hughes sought consent after the purpose of the stop had been completed.  *See Robinette III* at 239; *Rodriguez* at 1614; *Caballes* at 407.

{¶ 40} Furthermore, under the facts of this case, no separate reasonable suspicion of other criminal activity justified detaining appellant beyond completion of the investigation of the traffic violation.  *Tyler* at ¶ 15, quoting *State v. Owens*, 10th Dist. No. 03AP-423, 2004-Ohio-5159, ¶ 18 (" '[A]n investigatory stop which is prolonged and extends beyond the scope of the initial detention must be supported by a reasonable suspicion the suspect is engaged in another criminal activity.' "); *Robinette III* at 241; *Ferrante* at ¶ 21; *Retherford* at 601; *State v. Hobbs*, 9th Dist. No. 24764, 2010-Ohio-420, ¶ 14 (finding that facts gave rise to "reasonable articulable suspicion to conclude that other criminal activity was possibly afoot, which in turn warranted a further brief, investigatory detention").  Although Officer Hughes stated that he was familiar with appellant's past drug use, Officer Hughes did not testify that he possessed any reasonable suspicion that appellant was presently or was about to be engaged in some other criminal activity.

{¶ 41} Finally, we find that the second condition for a pat-down search was not satisfied.  Here, Officer Hughes sought consent to conduct a pat-down search absent any reasonable suspicion that appellant was armed and dangerous.  Although, as previously noted, Officer Hughes stated that he was familiar with appellant's past drug use, Officer Hughes did not testify that he had any reasonable suspicion at the time of the stop that appellant was armed and dangerous.  Therefore, the second condition for conducting a pat-down search under *Terry* is not satisfied under the facts of this case.  *Johnson,* 555 U.S. at 326-27.  Thus, because Officer Hughes sought appellant's consent to conduct a search following the completion of the stop and absent any reasonable articulable facts or individualized suspicion to justify appellant's continued detention in order to request to conduct a search, we find appellant's continued detention was unlawful.

2. Voluntariness of Consent

{¶ 42} Next, we examine whether appellant's consent was voluntary under the totality of the circumstances.  *Limoli* at ¶ 23-24; *Alihassan* at ¶ 26.  As we have previously stated, the analysis for whether or not appellant's consent was voluntary depends on

whether or not he was being lawfully detained at the time consent was sought. *Limoli* at ¶ 22. *See Retherford* at 602; *State v. Torres*, 6th Dist. No. L-07-1306, 2008-Ohio-2090, ¶ 21, citing *United States v. Holmes*, 505 F.3d 1288, 1295 (D.C.Cir.2007); *Ferrante* at ¶ 30-32; *State v. Henderson*, 11th Dist. No. 2006-L-110, 2007-Ohio-2315, ¶ 31; *Alihassan* at ¶ 27. Here, the trial court considered whether appellant's consent was voluntary in the context of a lawful detention. However, as we have found that appellant was unlawfully detained, the trial court analyzed appellant's consent under the incorrect standard. Therefore, we must remand in order for the trial court to consider whether appellant's consent was voluntary under the standard applying to an unlawful detention as we have outlined above in paragraphs 20 and 21. *Spain* at ¶ 29. *See Limoli* at ¶ 25, citing *State v. Hogan*, 10th Dist. No. 11AP-644, 2012-Ohio-1421, ¶ 17, citing *Burnside* at ¶ 8 ("When ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve factual questions and evaluate witness credibility.").

{¶ 43} Accordingly, we sustain in part and overrule in part appellant's sole assignment of error, vacate the trial court's decision, and remand this matter to the trial court to conduct further proceedings.

## IV. Conclusion

{¶ 44} Having sustained in part and overruled in part appellant's sole assignment of error, we reverse the judgment of the Franklin County Court of Common Pleas and remand this matter for further proceedings consistent with law and this decision.

*Judgment reversed*
*and cause remanded.*

LUPER SCHUSTER, J., concurs.
SADLER, J., concurs in part and dissents in part.

SADLER, J., concurring in part and dissenting in part.

{¶ 45} Because I agree with the majority's conclusion that this matter must be remanded to the trial court for additional proceedings, but I disagree with the scope of the remand, I respectfully concur in part and dissent in part. I would reverse the judgment of the trial court and remand the case for the trial court to initially determine whether Officer Hughes obtained appellant's consent to a pat-down search for weapons during a consensual encounter or during an unlawful seizure.

{¶ 46} As the majority noted, in *Ohio v. Robinette*, 519 U.S. 33 (1996), the United States Supreme Court held that an officer need not inform a suspect that he or she is free to go in order for the reviewing court to determine that police obtained consent to a search during a consensual encounter rather than a seizure. *Id.* at 36. It stands to reason then that when an officer informs a suspect that he or she is free to go, a reviewing court may determine, based on the totality of the circumstances, that the encounter has become consensual and the subsequent consent voluntary. *Id.*

{¶ 47} There is no dispute in this case that Officer Hughes informed appellant that he was free to go before he asked appellant for permission to conduct a pat-down search for weapons. "In determining whether a particular encounter constitutes a 'seizure,' and thus implicates the Fourth Amendment, the question is whether, in view of all the circumstances surrounding [his or her] encounter [with police], a reasonable person would believe he or she was 'not free to leave' or 'not free to decline the officers' requests or otherwise terminate the encounter.' " *State v. McDowell*, 10th Dist. No. 13AP-229, 2013-Ohio-5300, ¶ 18, quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *Florida v. Bostick*, 501 U.S. 429, 439 (1991); *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988); *Florida v. Royer*, 460 U.S. 491, 502 (1983) (plurality opinion). "[T]he test 'is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.' " *Columbus v. Body*, 10th Dist. No. 11AP-609, 2012-Ohio-379, ¶ 14, quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991). "This standard 'ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached.' " *Id.*, quoting *Chesternut* at 574.

{¶ 48} "[W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973).

{¶ 49} The majority adopted the following construction of the trial court decision: "Although not explicitly stated, based on the above record, the trial court appears to have concluded that appellant's continued detention following the initial traffic stop was a *Terry* stop and, therefore, lawful." (Majority decision at ¶ 38.) Because the initial *Terry* stop had clearly ended prior to the time Officer Hughes asked appellant for consent to conduct a pat-down search, and because there are no additional facts to support a reasonable suspicion that appellant was carrying a weapon, the majority concludes that Officer Hughes obtained consent during an unlawful detention of appellant. Accordingly, the majority reverses the trial court decision and remands the case for the trial court to determine whether appellant's consent was voluntary under the stricter standard applicable to unlawful detention.

{¶ 50} The trial transcript also reveals the following:

> THE COURT: The initial stop, I don't particularly have a problem with it. He saw the traffic violation. That's the thing.
>
> He has certain rights under *Terry* to search *at that point in time*. It is the hour of the day, you know, and various other aspects. *Then the issue of consent comes up.*
>
> MR. ESSEX: Well, I think –
>
> THE COURT: *Because if he doesn't have consent, he's exceeded Terry.*

(Emphasis added.) (May 7, 2015 Tr. at 55-56.)

{¶ 51} The trial court acknowledged that the pat-down search for weapons was not within the scope of the initial *Terry* stop. Rather, the trial court found that appellant voluntarily gave his consent to the pat-down search. Based on the above, it is reasonable to conclude that the trial court found that Officer Hughes obtained appellant's consent during a consensual encounter immediately following the initial *Terry* stop.

{¶ 52} In my view, because the trial court decision is reasonably susceptible to a different construction than is suggested by the majority, this court should not choose a construction that forecloses the possibility that Officer Hughes obtained appellant's consent to the pat-down search during a consensual encounter. That is a factual finding that must be made by the trial court in the first instance. *Bustamonte* at 226. *See also*

*State v. Hannah,* 10th Dist. No. 15AP-12, 2015-I-4964, ¶ 20 (competent, credible evidence supported the trial court determination that appellant was not detained by police when he consented to a search of his person).

{¶ 53} Based on the foregoing, I would reverse the judgment of the trial court and remand the case with instructions for the trial court to initially determine whether Officer Hughes obtained appellant's consent to a pat-down search for weapons during a consensual encounter or during an unlawful detention and to further determine, under the applicable standard, whether the consent was voluntary.

{¶ 54} Because the majority reverses the judgment but remands with different instructions, I respectfully concur in part and dissent in part.

---